George C. CYPRESS et al., Plaintiffs,

v.

The NEWPORT NEWS GENERAL AND NON-SECTARIAN HOSPITAL ASSO-CIATION, Incorporated, et al., Defendants.

Civ. A. No. 969.

United States District Court
E. D. Virginia,
Newport News Division.

March 14, 1966.

Philip S. Walker, Newport News, Va., Michael Meltsner, New York City, for plaintiffs.

Phillips M. Dowding, Newport News, Va., Arthur B. Davies, III, Lynchburg, Va., for defendants.

WALTER E. HOFFMAN, Chief Judge.

This is an action by a Negro physician, suing for the benefit of a class, and certain patients of said Negro physician, against the corporation owning and operating the Riverside Hospital in the City of Newport News, Virginia, and its hospital administrator. Stripped of nonessentials, the case turns on the denial of staff memberships to Dr. George C. Cypress and Dr. C. Waldo Scott, two physicians of the Negro race. There is also a claim of patient segregation at said hospital which will be discussed briefly but, in the opinion of the Court, has not been sufficiently developed to render a ruling thereon.

Riverside Hospital, financed in part by a grant of $2,250,000 from the United States under the Hill-Burton construction program, is a modern hospital affording a wide range of medical services and facilities. There are 323 beds available for patients of all races. No patient so admitted can be treated by a physician who is not a member of the Riverside staff. There are 117 medical doctors on the staff, none of whom is a Negro.

Dr. Cypress is a board certified pediatrician. He is an attending pediatrician at Dixie Hospital, Hampton, Virginia; Chief of Pediatrics, Medical Director and Chief of Laboratories at Whitaker Memorial Hospital, Newport News, Virginia; consultant pediatrician at Fort Eustis Army Hospital, where from 1958 to 1960 he spent four hours each day for five days a week; a part-time school physician for the Newport News public school system and the Virginia State School for Deaf, Dumb and Blind; a

member of the consultant staff of Williamsburg Community Hospital; he operates a "well-baby" clinic for the City of Newport News; and has an unofficial connection with the Fort Monroe Army Hospital. The geographical area of the professional activities of Dr. Cypress extend from Fort Monroe to Williamsburg, a distance of approximately 40 miles, and his patients come from an even more extensive area. He freely concedes that he has a problem when he has seriously ill patients in more than one hospital as he practices alone and has no arrangement with any other pediatrician to "cover" for him. Indeed, one of his own witnesses, Dr. Eichenfield, testified that pediatricians are better able to handle their profession by confining staff membership to one hospital.

Dr. Cypress applied for staff privileges at Mary Immaculate Hospital in Newport News on two occasions, but was rejected each time. Dr. Scott, the other Negro physician mentioned herein, likewise applied at the same time. Initially he was rejected but, on reapplication, was accepted for staff membership at Mary Immaculate.

Riverside Hospital, like all other hospitals in the area including Dixie and Whitaker, requires attendance at staff meetings to maintain staff membership. Dixie holds a monthly meeting, whereas Whitaker holds meetings twice each month.

Dr. C. Waldo Scott is a board certified surgeon practicing in Newport News. He is a staff member at Whitaker, Mary Immaculate and Dixie, all located in the Newport News-Hampton area. He is likewise a consultant at the Veterans Administration Hospital at Kecoughtan in Hampton, Virginia. Dr. Scott maintains his professional office in the Whitaker Memorial Hospital.

There are approximately 18 Negro physicians licensed to practice medicine in the Newport News-Hampton area. There are also approximately 169 physicians of the Caucasian race in the same locality. Drs. Cypress and Scott are the only Negro physicians who have sought staff membership at Riverside Hospital.

Much of the testimony relates to the professional qualifications and ability of the two Negro physicians involved. We think it sufficient to state that, in their specialty fields,[1] they are highly qualified according to this record. Of course, like lawyers and other professional men, there is a natural reluctance to openly speak in opposition to a colleague in the profession. Nevertheless, the educational and professional qualifications and general competency in the specialized fields enjoyed by Drs. Cypress and Scott appear to be excellent.

Prior to the decision of the United States Court of Appeals for the Fourth Circuit in Simkins v. Moses Cone Memorial Hospital, 4 Cir., 323 F.2d 959, cert. den. 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed. 2d 659, it was generally recognized that private hospitals, even though aided by Hill-Burton funds, were not so affected by "state action" as to render them instrumentalities of government and thus within the reach of the Fifth and Fourteenth Amendments to the Constitution of the United States. Such was the ruling of the United States District Court for the Middle District of North Carolina in *Simkins,* decided December 17, 1962. In part at least, Judge Stanley, the author of the *Simkins* decision on the district court level, relied upon the prior decision of the United States Court of Appeals for the Fourth Circuit in

1. Dr. Cypress is a pediatrician. He is the only Negro pediatrician in Newport News. The six white pediatricians in Newport News are on Riverside's staff, with four of them practicing together as a group and the other two as partners. As Dr. Cypress lives in Hampton, and as his previous testimony relates to physicians in the Newport News-Hampton area, we think it a fair assumption that the seven pediatricians are from the Newport News-Hampton area. Dr. Scott is one of 19 general surgeons in the Newport News-Hampton-York area and is the only Negro general surgeon. Fifteen of the eighteen Caucasian general surgeons are on the staff at Riverside.

Eaton v. Board of Managers of James Walker Mem. Hospital, 261 F.2d 521, cert. den. 359 U.S. 984, 79 S.Ct. 941, 3 L.Ed.2d 934 (1958). Moreover, in Virginia, the precedent decision was Khoury v. Memorial Hospital, 203 Va. 236, 123 S.E. (2d) 533 (decided January 15, 1962), holding that a private hospital, even though a recipient of Hill-Burton funds, had the power to select its own staff. However, on November 1, 1963, the *Simkins* case was reversed by the Court of Appeals and, at that moment, the law essentially changed and otherwise private, nonprofit hospitals thereupon came within the ambit of the Fourteenth Amendment. Cf. Hawkins v. North Carolina Dental Society, 4 Cir., 355 F.2d 718, decided January 20, 1966.

The foregoing legal climate is projected into this portion of the Court's memorandum as it will serve to explain the reasons with respect to the final conclusions herein reached.

It was in this legal setting that Dr. Cypress on April 15, 1961, filed his initial application for staff membership at Riverside. The circumstances surrounding the procurement of the application are not in the record, but there is no indication that he was told that he would be refused admission because of his race. The hospital administrator who processed Dr. Cypress' first application died prior to this trial. The normal processing of any such application is best described by the present administrator as follows:

"The application is presented to the administrator by the person or physician applying. Once the references have been checked and letters of recommendation have been received, it is presented by the administrator to the executive committee of the medical staff which acts as the credentials committee. From the credentials committee or the executive committee, it is sent to the specialty staff of the particular specialty that the physician is applying for. From the specialty staff, it is sent to the general staff, at which time the entire general staff of the hospital votes on the application. With the recommendation of the general staff either for or against, it is presented by the administrator to the board of managers of the hospital for their final approval."

The foregoing procedure is substantially similar to that followed by other hospitals throughout the nation.

When Dr. Scott sought staff privileges at Riverside in March, 1963, he called at the administrator's office and inquired as to whether any rule or policy precluded Negro physicians. He was told that there was no such rule or policy and that he was at liberty to take an application and apply for membership. Dr. Scott asked what the administrator thought his chances would be as to acceptance and was told that the administrator had no reason to believe that staff privileges would be denied.

The initial Cypress application was denied and a letter to this effect, dated July 7, 1961, was forwarded to Dr. Cypress by the administrator. He reapplied in the spring of 1962 and was again denied by letter dated April 20, 1962.[2] He has made no subsequent effort to reapply and this action was filed on October 11, 1963. The reasons for the denials are not revealed by the letters.

The initial Scott application was transmitted by letter from Dr. Scott dated March 18, 1963. It was denied by letter dated June 21, 1963. Dr. Scott has not seen fit to reapply for staff membership.

The applications appear to be in order with one exception. Dr. Cypress represented that he was, at the time of the application, a member of the Virginia Pediatrics Society. As a fact he was not a member and never had been a member. His explanation is that he had attended meetings of the Society and received its

2. There is evidence in the record that the denial of the second application was based upon the fact that less than one year had elapsed since the denial of the first application and that this fact was discussed.

bulletins. There is no evidence that this apparent misrepresentation was ever considered in rejecting the application; nor is there any suggestion that the apparent error or falsity was ever discovered prior to the preparation for the trial giving rise to this memorandum. Nevertheless, it is difficult to believe that Dr. Cypress, a highly educated man, could have believed that he actually held membership in this Society.

The General Staff of Riverside Hospital controls the membership of the staff. It votes by secret written ballot and no applicant is entitled to a hearing. A three-fourths majority ballot is necessary to elect. The General Staff has established by-laws, rules and regulations. Without detailing the qualifications for membership set forth in the documents mentioned, it can merely be said that Drs. Cypress and Scott meet the basic requirements. The documents do not mention race. Applications can be accepted, deferred or rejected. If accepted, privileges are granted. The Board of Managers (the controlling body of the hospital) must either accept the recommendation of the General Staff or refer it back for further consideration stating the reasons for such action. While the documents refer to "report of findings" and "reasons for such action," the management history reflects that nothing is ever written as to the reasons for acceptance, deferment or rejection, other than what appears on the application or in the minutes. There is a proviso that the administrator, after conference with the chief of service or his appointee, has authority to grant *temporary* privileges to a physician who is not a member of the General Staff for a period not exceeding three months.

The General Staff is divided into honorary, consulting, active, teaching, dental and courtesy groups. For the purpose of this discussion we think it sufficient to deal only with the Active Medical Staff which comprises the bulk of the membership. It is this group in which Drs. Cypress and Scott sought membership. It is this group which must attend regular monthly meetings and such special meetings as may be called, to the extent of 50% of said meetings unless excused by the Active Staff, and absence from four consecutive meetings shall be tantamount to a resignation unless excused by the Executive Committee. In the absence of a quorum (50%) the election of new members may be conducted by the members present, with the remaining members voting by mail.

Seeking membership to the medical staff of a hospital is not comparable to joining a fraternal or civic body. It entails many responsibilities and duties in addition to mere attendance at staff meetings. Among other things, it requires that (1) private physicians attend their own "paying" patients; (2) they contribute time and effort in attendance of "free" patients; (3) they bear the responsibility for the preparation of a complete medical record for each patient; (4) they participate in staff discussions and review of specialized cases; (5) they indicate willingness to lead discussions at staff meetings in any case selected for consideration where that physician is in attendance; (6) they participate in committee activity, more particularly in the specialty field of the staff member; (7) they indicate a willingness to assume "teaching" duties in the specialty field for a period of at least one year. Thus it will be readily seen that any physician seeking staff privileges must be in a position to give liberally of his time, efforts and experience in any hospital. Mere competency in the profession and fulfillment of "paper" requirements for admission is insufficient. While the by-laws, rules and regulations do not refer to any limitation on staff memberships in other hospitals, it goes without saying that this is a proper factor for consideration, conditioned that the regulation is equally applied to all without regard to race, creed or color. The hospital could require that a physician cause a certain percentage of his hospital patients to be admitted to that hospital as a condition for admission and retention of membership, again assuming that the regulation is applied

equally to all physicians. The hospital could specify the amount of time each physician should give in attendance of "free" patients in the specialized field of that physician, applying the rule equally as to all physicians within certain age brackets. The physician's reputation in the community, his availability, habits, ethics, and other innumerable criteria are appropriate in determining staff membership. These are matters which are peculiarly within the field of the hospital administrators and the great body of capable physicians formulating staff policies. The difficulty with any consideration of these factors by the General Staff in passing upon the applications of Drs. Cypress and Scott is that we do not know what factors were considered in rejecting the applications. If they are valid reasons applicable to all, without regard to race, the applicants should be rejected. If race is the obstacle which brought about their rejection, they should be admitted. With a secret written ballot and no opportunity for a hearing, it is most difficult to determine. Moreover, the action of Riverside and its General Staff was taken prior to the decision in *Simkins* at a time when the law clearly stated that Riverside was not such an institution as could be affected by "state action." That principle of law was changed by the *Simkins* case on November 1, 1963, and, according to this record, no Negro physician has applied for membership since November 1, 1963.

■ It is, of course, elementary that Riverside was not required to accept Dr. Cypress merely because he was the first Negro applicant for membership. Nor was Riverside required to accept the second Negro applicant, Dr. Scott. The defendants concede the binding legal effect of the *Simkins* case. If such were not the situation, this Court would have enjoined the defendants many months ago. The

issue in this case is whether the mere rejection of the first two applications from Negro physicians constitutes discrimination which is violative of the due process requirements of the Fourteenth Amendment. From early 1962 until April, 1964, there were approximately three white physicians rejected according to the administrator's discovery deposition. On rechecking, and at the time of trial, the administrator testified that there had been 11 or 12 applications of white physicians rejected between 1958 and July 14, 1964, out of a total of approximately 25 applications. It follows that the rejection rate is high, even as to white physicians.

This record is devoid of affirmative evidence showing discrimination for reasons of race alone.[3] What stands out, however, is the very obvious fact that no Negro physician has ever been admitted to staff membership although, of course, only two have applied. Drs. Cypress and Scott were not discouraged from seeking staff membership; nor were they required to do anything more (or less) than a white physician thus applying. Riverside has never made any public or private announcement that staff privileges were confined to white physicians. As the Fifth Circuit said in Meredith v. Fair, 298 F.2d 696:

"The existence of this policy is an important factor in determining the purposes and effects of statutes and actions superficially innocuous. The existence of the policy and its effect as a guiding force, however, do not relieve the plaintiff of the necessity of showing in this case that the policy was applied to him to produce discrimination on the ground of race. James Meredith, like any applicant for admission to a university, may be denied admission on non-discriminatory grounds."

3. Plaintiffs took the discovery testimony of Drs. Mitchell, Williams, Caldroney, and Evans. They did not see fit to call any of these physicians as witnesses. Plaintiffs introduced only the discovery depositions of St. Clair (the hospital administrator) and Hutchens (Chairman of the Board of Managers) under the adverse party rule. No physician having staff privileges at Riverside testified at the trial.

It may well be argued that there is a justifiable inference of discrimination from the denial of applications from Drs. Cypress and Scott. Hawkins v. North Carolina Dental Society, supra. There must be some rule of law which will assist in carrying into meaningful effect the *Simkins* decision. We think that the rule should be stated as follows: Where no Negro physicians are on the hospital staff and application in proper form is made for staff membership by a Negro physician who meets the "paper" qualifications and proves his competency in his chosen specialty field (if any), a *prima facie* inference of discrimination exists wherever the action on said application is by secret ballot and without hearing from the applicant, but that inference disappears when a reasonable explanation is presented (either from the testimony of plaintiff's witnesses or those presented by defendant) tending to show that the denial of staff membership was not due to the race, creed or color of said applicant and, in any event, the ultimate burden of proof to establish that the denial of said application was discriminatory because of race, creed or color rests upon the plaintiff asserting the deprivation of his constitutional rights.

Tested by this judicially created rule of law, this Court is of the opinion that the plaintiff, and those of his class [4] desiring to seek such staff membership, should now be permitted to apply or reapply for staff membership. The procedure for processing such applications is, as heretofore indicated, essentially the same as in other hospitals throughout the length and breadth of our country. The applications may be accepted, deferred or rejected. The ever-changing climate may bring about a different result, but this is not to suggest that any contrary result should be reached. The fine physicians who comprise the General Staff are undoubtedly well aware of the binding effect of the *Simkins* case, and they would not want to jeopardize the hospital's rights to secure additional Hill-Burton funds if needed. Furthermore, the Civil Rights Act of 1964 is now effective, thereby forbidding discrimination against any person on the ground of race, color, or national origin as to any program or activity receiving federal financial assistance. While the plaintiffs, on the basis of this record, have not carried the ultimate burden of proof, the Court feels that, in fairness to the class of Negro physicians and the hospital and pursuant to its general equity powers, reapplications should now be submitted and considered. At the expiration of sixty days from the date of the filing of this memorandum, if no applications are submitted for consideration, or at an earlier date if Drs. Cypress and Scott do not intend to reapply, a final decree will be entered for the defendants.

There remains the matter of ground rules in the event applications are submitted and, after consideration, are denied. With a secret written ballot and no opportunity provided for interrogating the applicant, one would never know whether race was the principal reason for rejection. Nor does this Court deem it appropriate that there should be any judicially-created review from the final action taken by the hospital authorities. However, fundamental fairness in the concept of due process entitled such a rejected applicant to request a hearing, at the expense of said applicant, before the General Staff which essentially makes the final decision. Such a "hearing" is not public and statements made should not be governed by the complexities surrounding legal rules of evidence. Such a "hearing" is no place for attorneys—the applicant is not on trial, nor is the General Staff. A competent reporter capable of taking verbatim notes of the interrogation should be provided at the expense

---

4. Defendants contend that the action by Dr. Cypress is not properly a class action. It is true that Drs. Cypress and Scott are the only Negro physicians who have applied at Riverside, but two other Negro doctors expressed their interest in staff privileges. As to the issue of the right to bring a class action on this phase of the case, the Court holds with the plaintiff.

of the applicant. It is not a matter of sworn testimony, burden of proof, etc., but such a "hearing", more properly denominated a "conference" or "interview", will enable the General Staff to question the applicant at length. Having interrogated the applicant, it is entirely appropriate that he be excused, subject to being recalled, to permit the staff members to discuss, with the reporter present, the merits or demerits of his application, qualifications, reputation, ethics, availability and other factors. If hearsay statements are made, they may be considered and, if deemed proper, the application may be deferred pending an investigation. The applicant may be recalled at the time of the conference or later if appropriate for such further questioning as may be desired. In short, the rejection of any application should be only after a full and fair opportunity to consider all aspects pertaining to the individual applicant. As the rejected applicant is seeking the conference, he may be required, as a condition of said hearing, to execute a general release in favor of the hospital, its employees, General Staff, and any individuals interrogated pursuant to any investigation, as to any statements made by anyone in connection with said application or any investigation made before or after said conference. He may be required, subject to the consent of his patient or former patient, to authorize the examination of records in specific cases, and if such authority is not given, the General Staff may draw inferences therefrom. In summary, if the applicant seeks to attack the integrity of the General Staff by claiming that its members are rejecting him because of race, the applicant's life and professional competence must become an "open book."

This Court has confidence in the excellent physicians who comprise the General Staff. They know, as everyone knows, that Riverside Hospital must admit Negro physicians to its Active Medical Staff at some date in the immediate future. They know, as everyone knows, that the old days of massive resistance are gone. They know, as everyone knows, that hospitals throughout the nation are admitting qualified Negro physicians to their staffs. On the other hand, an applicant should not be accepted merely because he is a Negro physician, or the first or second Negro applicant. His application should be considered on the same basis as that of any white physician.

Counsel for plaintiffs further urge that "patient segregation" be eliminated. We do not believe that these plaintiffs have any standing to complain with respect to the practice of not putting Negro and white patients in *the same room*. This is a complex matter which involves the delicate situation of the patient's feelings as related to his general health. Moreover, the issue is already before this Court in a case filed by certain of the same counsel against the Dixie Hospital. As noted, Riverside admits patients without regard to race; they are placed in adjoining rooms and on the same floors; in pediatrics they are sometimes placed in the same room with the permission of the parents of the children. No witness has testified that he ever sought admission to a room occupied by a person of another race, but Riverside concedes that its practice is not to assign Negro and white patients to the same room.

A decree will be entered consistent with the views expressed herein, reserving the right to said plaintiffs as a class to seek supplemental relief in the event that applications or reapplications filed within sixty days from the date of this memorandum are ultimately rejected or, following a reasonable period for action on said applications, are indefinitely deferred without satisfactory explanation for the delay. If the plaintiffs do not elect to apply or reapply within said period, but would prefer appealing from the ruling herein made, a final decree may be entered in favor of the defendants.