Randy BRADY; James Williams; M. Fox; Jerry Hunter; Francis Pendergrass; Lacy Monds; Cris Watkins; Curtiss Crawford and Lorenzo Mosely, Appellees,

v.

THURSTON MOTOR LINES, a corporation, Appellant.

No. 82–1238.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1983.

Decided Jan. 18, 1984.

W.T. Cranfill, Jr., Charlotte, N.C. (J.W. Alexander, Jr., Blakeney, Alexander & Machen, Charlotte, N.C., on brief), for appellant.

Michael A. Sheely, Charlotte, N.C., for appellees.

Before WIDENER and PHILLIPS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

This case returns to us from a remand to the district court. *Brady v. Thurston Motor Lines, Inc.,* 673 F.2d 1306 (4th Cir.1982) (unpublished). The district court had ruled that Thurston Motor Lines, Inc., had engaged in discriminatory employment practices against black employees at its terminal in Charlotte, North Carolina, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and the Civil Rights Act of 1866, 42 U.S.C. § 1981.. We remanded the case with instructions to clarify the allocation of the burden of proof in light of *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), which was decided after the court's entry of judgment. The district court then amended its judgment to specify the burden of proof it imposed on each of the parties. 532 F.Supp. 893.

We affirm the judgment on all issues save two. In summary, we hold: (1) the district court properly allocated the burden of proof between the parties; (2) its findings are entitled to review under Federal Rule of Civil Procedure 52(a); (3) the judgment that Thurston discriminated against Randy Brady, Jerry Hunter, Michael Fox, Francis Pendergrass, and James Williams is affirmed; (4) the judgment that Thurston discriminated against Curtiss Crawford is reversed; (5) lack of claimants has mooted the issue of class certification dealing with initial job placement; in all other respects the judgment pertaining to the class is affirmed; and (6) the court did not abuse its discretion in ordering injunctive relief or in awarding attorneys' fees. We deny the employees' motion to strike a portion of the appendix submitted by Thurston.

I

As a preliminary matter, Thurston raises two objections to the judgment entered on remand. First, it argues that the district court's modification of its order neither satisfied the mandate of this court nor adhered to *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Second, Thurston urges that the findings of fact entered by the district court cannot be reviewed under the "clearly erroneous" standard of Rule 52(a) but rather are subject to the "careful scrutiny" of *EEOC v. Federal Reserve Bank,* 698 F.2d 633, 641 (4th Cir.1983), *cert. granted sub nom. Cooper v. Federal Reserve Bank,* —— U.S. ——, 104 S.Ct. 334, 78 L.Ed.2d 305 (1983).

In response to our remand, the district court reviewed the evidence against Thurston and its notes of the trial. It then amended its judgment to reflect more clearly the method of proof it used. The district court wrote that it "did not put any burden

of proof upon the defendant, *but did require the plaintiff to sustain the burden of proof as to every essential element of the claim of each plaintiff* and the claims of the class (emphasis in original). It added that the "defendant has had no burden of *persuasion*" and that the "plaintiffs on every issue in this case have always had the burden of proof."

■ After the district court concluded its proceedings on remand, the Supreme Court announced its decision in *U.S. Postal Service v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). In that case, the Court noted that the ultimate factual question in an employment discrimination case is simply " 'whether the defendant intentionally discriminated against the plaintiff.' " 103 S.Ct. at 1482. The plaintiff has the burden of persuading the court to believe his own explanation of the employer's motivation in making an employment decision. As in any case, however, the plaintiff may prove his claim by direct or circumstantial evidence. 103 S.Ct. at 1481 n. 3.

■ The district court's analysis of the evidence and its imposition of the burden of proof are consistent with the principles explained in *Aikens* and *Burdine.* On remand, it has complied with our mandate.

■ Thurston's second contention, that the district court's findings of fact are not entitled to review under Rule 52(a), is without merit. Thurston relies on our recent decision in *Federal Reserve* to support its argument. In that case, the district court itself actually made no findings of fact as that term is used in Rule 52(a). Rather, the district court in its original Memorandum of Decision confined itself to a "purely conclusory statement ... of ultimate fact" and directed counsel for the plaintiff to submit proposed findings of subsidiary facts. 698 F.2d at 640. We held that, where a district court's findings of fact are the result of such a "one-sided" presentation of the evidence, the findings will be subject to "careful scrutiny" on review. 698 F.2d at 640–41.

Here, in contrast, the district court demonstrated that its findings of fact were the result of an independent and impartial inquiry. First, its original Memorandum of Decision contains a detailed discussion of the individual claims made without findings proposed by plaintiffs' counsel. While the discussion of class relief was more general, the decision as a whole is far more than a purely conclusory statement of ultimate fact.

Moreover, presentation of facts to the district court was not one-sided. Unlike the procedure followed in *Federal Reserve,* the district court asked for proposed findings of fact from both parties before entering its judgment. Thurston was given an opportunity to press its views upon the court by submitting extensive proposed findings of fact and conclusions of law.

In addition, the district court on remand re-examined its findings of fact and conclusions of law. It supplemented its findings with respect to the class and to each named plaintiff. In contrast to *Federal Reserve,* appellate review is now concerned with the record as supplemented by the proceedings on remand.

## II

Thurston is a large interstate trucking firm which transports a variety of commodities. All plaintiffs worked at its terminal. They were among the more than 400 persons employed by Thurston there at any given time during the period in question—January 1, 1973, to May 31, 1977. The terminal is a large warehouse with 80 freight doors on 3 sides of the building. Warehousemen load and unload trucks largely by hand or with the aid of dollies and fork-lifts. They are supervised by line foremen, who in turn answer to supervisors. The terminal manager is the ultimate authority at the terminal.

The terminal also employs a number of clerical workers. Among these are OS & D (overage, shortage, and damage) clerks, whose job it is to locate and handle certain types of freight. Others are billing, rating, tracing, and general office clerks. Thur-

ston employs a number of truck drivers. These include switchers, who switch cabs to trailers and back trucks into the freight doors, city drivers, and trip-rate or long-distance drivers.

Eighty-one percent (87 of 107) of all black employees hired at the terminal between January 1, 1973, and May 31, 1977, were placed as warehousemen. This compares to 48 percent (240 of 500) of all white terminal employees hired during the same period. The evidence also disclosed that 27 percent of all warehousemen hired were black, while only 7 percent of all other terminal hires were black. There were no black supervisors at the terminal before 1974. The ratio of white to black promotions as a percentage of the white and black work forces for the 1973–76 period ranged from a high of 5.7:1 in 1974 to a low of 1.4:1 in 1973. At no time during the years in question were the proportions either equal or in favor of black employees. From 1973 to 1976, 13 white employees were transferred to clerical positions, compared with no black employees. Over the same period, 14 white employees became driver-trainees, while only 1 black employee entered the program.

There were no written job descriptions or qualifications at Thurston. Only nonsupervisory, nonclerical job openings were posted at the terminal, at least until May 1976. Employees interested in these openings made their bids orally to the supervisors. There was no written system of promotion or transfer. There was apparently only one vague criterion for promotion or transfer: "the best qualified." Who was best qualified was determined on an entirely subjective basis; there was no formal or even informal evaluation system at the terminal. The supervisor's recommendation was necessary for promotion or transfer. All persons responsible for hiring were white, and the supervisory force at the terminal was "basically all white."

There was no written system or guidelines for discipline at the terminal. The type of system used by a foreman, whether progressive warnings or summary termination, differed from person to person.

"Common sense" was the only guide to discipline. The court also found that black employees suffered proportionally more involuntary terminations than white employees as a consequence of this system. In 1976, for example, 22.8 percent of the black work force was involuntarily terminated, compared with 13.9 percent of the white work force. The black percentage of involuntary terminations exceeded the white proportion for three of the four years in the 1973–76 period, and the percentages were almost equal in the fourth year. Finally, the court found instances of retaliatory discharges.

When forklift assistance was required at a freight door, the warehouseman plugged in a light to notify the forklift drivers. Specifically identified white forklift drivers would repeatedly bypass black warehousemen to aid white warehousemen even though black workers had been waiting longer. The district court credited testimony disclosing this situation, and it found that this practice affected the production of black warehousemen by "slowing down their capability to load or unload trailers."

Several witnesses at trial testified that black warehousemen consistently received more difficult work assignments than white employees. This was accomplished in the following manner. Warehousemen were given an assignment sheet with the bills of lading when they were assigned a truck to work. It was undisputed that, by examining the bills of lading, a knowledgeable person—such as the shift supervisor who made the assignments—could tell what the weight of the load was and what types of packages were probably on the truck. Witnesses testified that hand freight loads were the most difficult, for they required unloading each piece by hand—an obviously time-consuming process. Witnesses also testified that certain loads—J.C. Penney trucks, for example—were always difficult because they contained a great deal of hand freight. The court credited this testimony and found that black workers were often given job assignments after the supervisor had flipped through the stack of jobs.

White employees, on the other hand, were regularly assigned jobs consecutively—that is, from the top of the stack. Although Thurston employed a complex formula to compute the time a load should take to complete, the court found that the more difficult loads often caused black warehousemen to exceed that time and thus affected their production.

The court found that six of the black employees had proved disparate treatment because of race. It ruled in favor of Thurston on other individual claims. The court found that Thurston discriminated against black employees as a class in certain areas of employment. It mandated stage II proceedings before a special master and referred the claims of the class and the successful plaintiffs to him for further proceedings. It also granted injunctive relief and attorneys' fees.

Thurston appeals from all aspects of the court's judgment adverse to it. The unsuccessful claimants have not filed cross-appeals.

### III

All of the individual plaintiffs allege disparate treatment on the basis of race. We will deal with each claim separately.

#### Randy Brady

Brady claimed that Thurston denied him two promotions to line foreman in favor of less experienced white employees and that Thurston discharged him in retaliation for his filing charges with the Equal Employment Opportunity Commission.

The district court found the following facts. Brady was employed at the terminal as a warehouseman from February 1973 until his discharge in October 1976. Though hired as a warehouseman, Brady occasionally worked as an OS & D clerk and fill-in line foreman. The position of fill-in line foreman is not a separate job classification from warehouseman, nor does it carry with it any change in status or pay. Rather, it is a position used by the company when the regular line foreman is absent "to observe ... individuals for the purpose of

determining whether they could perform adequately as foremen."

Although Brady claimed that a white person was hired ahead of him for an OS & D position in 1974, no evidence introduced by Brady indicated that employee's name or the date of the vacancy. In addition, despite Brady's claim that Charles Cape was hired ahead of him into a line foreman's position in November 1975, the court found that no one named Charles Cape was ever promoted to line foreman.

In January 1976, Brady expressed an interest in another line foreman's position that had become available. Brady's supervisor asked him if he could "get along with the soul brothers." The position was later filled by a less experienced white employee, Leonard Knox. Brady filed charges with the EEOC in February 1976. In April, management personnel asked him to withdraw the charges. Brady refused. After this, Brady was given harder warehouse assignments. He was terminated in October for absenteeism. The court held that Brady was entitled to relief on his January 1976 promotion claim and on a claim of retaliatory discharge. It referred Brady's other line foreman promotion claim and his OS & D claim to stage II proceedings.

Thurston introduced evidence that Brady was late to work 102 times between December 28, 1975, and his discharge in October 1976. It introduced evidence that Brady was called into a corrective meeting about his tardiness in May 1976. Thurston's policy for supervisory promotions was to promote from within whenever possible. One consideration was attendance and work habits. Brady's discharge occurred when he came back from an absence caused by an injury to his leg. He brought a physician's note dated two days earlier that stated he was able to return to work. Thurston considered the intervening two days as unexcused absences and fired Brady. Thurston also introduced evidence of similar discharges.

The court found that Brady's attendance record was compiled from his time cards

after his discharge. The vast majority of his late arrivals were from one to three minutes, time that Brady testified was caused by waiting in line to punch the clock. There was no written evaluation of Brady concerning the foreman's job and thus no evidence that his tardiness was even considered by Thurston in refusing the promotion. Finally, Brady explained that the physician who wrote his note told him that he could return to work when he felt able. The note itself did not specify a date as to when he was to return to work. There is no evidence that Brady's supervisors ever asked him for an explanation.

The district court's findings that Brady was wrongfully denied a promotion to line foreman, and then discharged in retaliation for filing EEOC charges, must be accepted under the clearly erroneous rule, which applies to the question of discrimination. *Pullman-Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982). The court was also correct in referring Brady's other claims to stage II for further proceedings. *See Sledge v. J.P. Stevens & Co.*, 585 F.2d 625, 638 (4th Cir. 1978).

### Jerry Hunter

■ Hunter claimed that he was twice denied promotion to line foreman and was denied a transfer to a switching position, for which he sought training, on the basis of his race. He also alleged that he was discharged in retaliation for filing charges of discrimination.

The court found the following facts. Hunter was employed by Thurston from 1971 until his discharge on November 10, 1977. He was a warehouseman during that period but also was used as a fill-in line foreman. He trained junior white employees who were promoted to line foreman. Hunter was considered by his supervisor to be qualified for a line foreman position in late 1975. Two foreman positions were filled by white employees after Hunter was considered qualified.

Hunter then sought training for a switching position in 1976. He was refused trans-

fer and told that he would be more valuable as a foreman. Two white employees, both junior to Hunter, were then trained and given switching positions. Hunter was discharged for writing obscenities on bills of lading. The court concluded that he was entitled to relief on his claims of failure to promote and to transfer but could get no relief on his claim of wrongful discharge.

Thurston did not deny that Hunter was qualified to be a line foreman. Indeed, it introduced testimony that Hunter was twice offered promotions to line foreman, promotions that he refused. Hunter was said to have rejected the first because he did not wish to work the second shift. Hunter was said to have refused the second offer because he did not wish to work the third shift.

Thurston did not deny that the two junior white employees were given switching jobs after Hunter's request. It argues that the real reason Hunter was not transferred was that he did not wish to become a driver, the job to which switchers progress.

The district court's finding of discrimination is supported by the record. Hunter testified that he was never offered promotions to line foreman. Hunter, who was said to have turned down one line foreman position because he did not want to work the second shift, later transferred to the second shift and was on that shift when he allegedly turned down the second line foreman promotion.

Thurston's argument that Hunter was not trained as a switcher because he was not interested in driving is belied by a supervisor, who testified that Hunter was not transferred because "he would be more valuable to our company as a foreman."

### Michael Fox

■ Fox claimed that he was denied a transfer to an OS & D position or to a driving position in December 1975. He also claimed that he was discriminatorily discharged by Thurston.

■ The court found the following facts. Fox was employed by Thurston from Octo-

ber 1972 until January 1976 as a warehouse-man and forklift operator. He was injured in 1974. After being cleared by his physician, Fox returned to work but was injured again several times in 1974 and 1975. In December 1975, Fox informed Thurston that he could do no more heavy lifting due to back strain. He requested a position either as an OS & D clerk or as a driver. Both positions required the same type of lifting that Fox was unable to do. After being denied a transfer to those positions, Fox also requested some other type of light work. Instead, Thurston terminated him because he was physically unable to perform his duties. The evidence revealed that two white employees—Henry Lee and Jerry Cook—received light duty work on a temporary basis while they were injured.

The court found that Fox had no claim for Thurston's refusal to transfer him to OS & D or driving, as he was physically unable to do the work in those positions. It found, however, that Fox was discharged under circumstances in which white employees were given light duty, and it referred his claim to stage II proceedings for inquiry whether light work was available on a temporary or permanent basis.

Thurston offered the records of similar discharges to rebut the inference that Fox was treated differently. It also offered testimony that light work was infrequent at the terminal. Finally, it did not dispute that it had given light duty—guard duty and billing—to white employees who had been injured. That duty, however, had been only temporary.

The court's findings are not clearly erroneous. There is no evidence that Fox's foreman or his supervisor inquired into whether some type of light duty, comparable to that given injured white employees, might have been available. The fact that such duty may have only been temporary does not vitiate the court's conclusion. Fox was still entitled to the same treatment as white employees. If, for example, temporary light duty had been available and at the end of that duty Fox was still unable to return to his former position, Thurston

could have then discharged him. Similarly, if no light duty had been available, Thurston could have discharged him. Here, however, it discharged him without any type of inquiry into light duty work, something the court found that Thurston did not do to white employees. Finally, Thurston's evidence of similar discharges does not require reversal. None of the discharges was from the Charlotte terminal; none involved injured warehousemen. Indeed, only one discharge involved an injury, and that was to a Tennessee truck driver.

### Francis Pendergrass

The court found the following facts. Pendergrass was employed as a warehouse-man in August 1974. In early 1976, he became a forklift driver three days a week, but Thurston suspended him from this position for two months because he was tardy. Pendergrass failed to show that Thurston accorded white employees different disciplinary treatment under similar circumstances. The court held that Thurston's disciplinary suspension did not discriminate against Pendergrass.

Pendergrass also claimed that he was discharged in June 1978 in retaliation for filing charges with the EEOC. Thurston asserts that he was discharged for excessive tardiness and for three unexcused absences. It offered evidence that Pendergrass had been late 37 times from January 1978 to June 1978. It also offered evidence of similar discharges for tardiness and absenteeism. The court held that Pendergrass had been discriminatorily discharged.

The court found that Thurston knew that Pendergrass had filed charges with the EEOC. It also found that the three unexcused absences were, in fact, one excused absence and two other days in which he was marked absent after failing to work overtime. Pendergrass testified that his tardiness resulted from standing in line at the time clock because the shift was so big. The court found that Pendergrass had been given no warning about the sanctions that would be imposed for tardiness. We conclude that the court's finding that Thurston

had unlawfully discharged Pendergrass is not clearly erroneous.

### James Williams

Williams claimed that Thurston twice failed to promote him to a position as line foreman. He also claimed that his discharge was in retaliation for filing discrimination charges with the EEOC.

The court found the following facts. Williams was employed as a warehouseman by Thurston from October 1968 until January 1978. He worked frequently as a fill-in line foreman from 1969 until his discharge. He was considered qualified to be a line foreman. Williams was unable to specify the first vacancy for which he was passed over. The second vacancy was filled by a white employee, Jerry Cook. Cook had previously been employed as a dispatcher at another facility. The court referred this claim to stage II proceedings.

The court found that Williams was discharged for purportedly removing an out-of-service tag from a trailer he was assigned to unload. No one saw him remove the tag. Williams denied removing the tag and testified that he talked to the supervisor about unloading the truck with the tag. The supervisor then reassigned him to another truck. The supervisor testified that he had forgotten about the tag when he reassigned Williams and that he later found it in a wastebasket. The court held that Williams had been discharged for filing charges with the EEOC in July and October of 1976, for which he had received a right-to-sue letter in February 1977.

On appeal, Thurston has not briefed the court's decision referring Williams's claim of failure to promote to stage II. It did reiterate the argument it made at trial that Williams's termination was reasonably justified. The truck in question that day contained a headload. Thurston argued that by taking the tag off of the trailer Williams avoided having to remove the headload, since headloads are normally left on trucks in service. Thurston offered evidence of similar discharges of employees who took action that endangered lives, as the removal of the tag could have done. Finally, Thurston urges that even if it was mistaken about Williams's culpability, it acted in good faith in terminating him because it believed that he removed the tag.

The determination of a witness's credibility is one peculiarly within the province of the trier of fact and will only be disturbed if unsupported by the record. *See* 9 Wright & Miller, *Federal Practice and Procedure* § 2586 at 737 (1971). The court, after seeing and hearing the testimony of the witnesses, chose to believe Williams's version of the events. Its findings are not clearly erroneous.

### Curtiss Crawford

Crawford claimed that Thurston denied him placement as a driver-trainee and refused to promote him to line foreman. He also claimed that he was constructively discharged by Thurston.

The court found the following facts. Crawford was employed by Thurston as a warehouseman from August 1974 until May 1975. In early 1975, he applied for a position as a truck driver. His supervisor referred him to the head of the driving school. The head of the driving school told him that the school was closed. Thurston subsequently hired two white drivers. During 1975, Thurston hired 12 driver-trainees, and all were white. Also early in 1975, Crawford sought training as a fill-in line foreman. When his supervisor failed to respond to this request, Crawford went to the assistant terminal manager and was eventually allowed to fill in as a foreman. After Crawford appealed to the assistant terminal manager, the supervisor reprimanded and harassed him frequently. Crawford quit because of the increased pressure. The court found for Crawford on both the driver placement and constructive discharge claims, while rejecting an additional claim of failure to promote.

Crawford quit in May 1975. Some time during the year, Thurston reopened the school and admitted white applicants. There is, however, no evidence that Craw-

ford was working for Thurston when the school reopened. In fact, Crawford's testimony indicates that the school was closed during the months in 1975 that he worked at the terminal.

With respect to Crawford's constructive discharge claim, we think the record does not establish that Crawford's race motivated his supervisor. Rather, the evidence indicates that he retaliated against Crawford because Crawford went over his head to request work as a fill-in line foreman. Consequently, we reverse that portion of the district court's judgment pertaining to Crawford.

### IV

Thurston initially raises two procedural objections to the district court's order dealing with class discrimination. First, it argues that the class as certified by the district court did not meet the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1). Second, it contends that the named plaintiffs are not proper representatives for the class on the issue of initial job placement.

The district court conditionally certified the class prior to trial and then, after hearing the evidence, narrowed the class's scope. As finally defined, the class consisted of:

Plaintiffs Hunter, Pendergrass, Fox, Williams, and Brady, all black employees currently working at the Thurston Motor Lines Terminal ... or who have worked for Thurston ... at any time since August 6, 1975, who have been discriminated against on account of their race in connection with initial placement in jobs, job assignments among warehousemen, the provision of forklift assistance to warehousemen, transfers by warehousemen to other positions in the terminal or to driver positions, promotion of warehousemen to supervisory or managerial positions at the terminal or to driver positions, and terminations (actual or constructive), specifically including retaliatory discharges in response to the filing of employment discrimination charges. . . .

The court determined that there were at least 74 members in the class.

The district court's finding that, at the time of final certification, the class contained at least 74 members is not clearly erroneous. Thurston, however, argues that the number of persons who have appeared in stage II proceedings to file claims—twelve—establishes a lack of class numerosity.

Rule 23(a)(1) provides that one of the requirements for a class action is that the class be "so numerous that joinder of all members is impracticable." As this court has stated: "No specified number is needed to maintain a class action." *Cypress v. Newport News General & Nonsectarian Hospital Ass'n,* 375 F.2d 648, 653 (4th Cir. 1967). Rather, an "application of the rule is to be considered in light of the particular circumstances of the case." 375 F.2d at 653. Thus, a "court has broad discretion in deciding whether to allow the maintenance of a class action. . . . [G]enerally, unless abuse is shown, the trial court's decision on this issue is final." *Roman v. ESB, Inc.,* 550 F.2d 1343, 1348–49 (4th Cir.1976). *See Cypress,* 375 F.2d at 653.

The district court based its decision on numerosity on both the plaintiffs' and Thurston's evidence. The fact that now, several years after certification, few class members have asserted claims does not make the certification an abuse of discretion. Moreover, we are unwilling as a matter of law to hold that a class of 74 persons does not meet the requirement of numerosity. Previous cases, though uneven at best, suggest that a class as large as 74 persons is well within the range appropriate for class certification. *See* 7 Wright and Miller, *Federal Practice & Procedure* § 1762 at 596–600 (1972 & 1982 Supp.); A. Miller, *An Overview of Federal Class Actions: Past, Present, and Future* 22–23 (Federal Judicial Center 1977). Indeed, this court has held that a much smaller class can meet the numerosity requirement. *See Cypress,* 375 F.2d at 653 (18 members). The proper inquiry is whether an abuse of discretion has

been committed in light of all the circumstances. Here, we find no such abuse.

■ As noted above, the district court found class-wide discrimination in initial job placement. We hold that this issue is moot. It is uncontroverted that none of the named plaintiffs—including both those who succeeded and those who failed at trial—claimed discriminatory initial job placement. All originally received the position for which they applied. In the second stage proceedings, no member of the class made an initial job placement claim.

The Supreme Court noted in *United States Parole Commission v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980), that the "case or controversy" language of Article III of the Constitution requires that, at any stage of litigation, a justiciable case present a "live" dispute and that the parties contesting the issue have a "personal stake" in the outcome. Neither of these requirements is met here.

The issue of whether the named plaintiffs are proper class representatives on the question of initial job placement can hardly be deemed live. There is not a single past or present Thurston employee who has brought a claim of discrimination in initial job placement, and the period for raising such claims at the stage II proceedings expired more than two years ago.

■ Nor do the plaintiffs in this case have a "personal stake" in the resolution of the initial job placement question. To avoid mootness, it is not always necessary that the named plaintiffs maintain the claim of the class they represent. After a class action is certified, the class of unnamed persons acquires a legal status separate from that of the named plaintiffs, and the suit may proceed after the named plaintiffs' claims are no longer justiciable. *See Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1975). But there can be no such unnamed claimants here, where no initial job discrimination claim has been made and the period for making such claims has expired. The lack of any claimants at any time establishes that the requisite adversary relationship does not exist to litigate this aspect of the class certification. *See Franks v. Bowman Transportation Co.,* 424 U.S. 747, 755–56, 96 S.Ct. 1251, 1259–60, 47 L.Ed.2d 444 (1976).

■ It is of no consequence that none of the parties has raised the question of mootness. Litigants cannot, by their own act or omission, invoke the jurisdiction of a federal court where there is no "case or controversy." *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 7–8, 98 S.Ct. 1554, 1559, 56 L.Ed.2d 30 (1978).

■ In all other respects, we affirm the district court's findings of discrimination against the class of black employees at Thurston. The finding of discrimination in transfers and promotions is supported by the absence of written job descriptions and qualifications, the failure to post job openings, the subjective nature of personnel decisions, the "basically all white" composition of the supervisory force, the paucity of job changes among blacks, and other historical facts, including the evidence pertaining to the individual claimants. *See generally Barnett v. W.T. Grant Co.,* 518 F.2d 543, 549–50 (4th Cir.1975). This and other evidence, including the absence of disciplinary guidelines and the plaintiffs' evidence on discharges, supports the holding that there was discrimination in terminations. Testimony supports the findings of discrimination in provision of forklift assistance and in job assignments among warehousemen. The district court's findings were based in part on testimony that conflicted with Thurston's. But the court, as trier of fact, was entitled to credit some evidence and to disbelieve other evidence. Thurston has not shown that the court's resolution of credibility is clearly erroneous.

V

The court's decree enjoined Thurston's employment practices in the areas in which the court found discrimination and imposed on Thurston the duty to create nondiscriminatory working conditions at the terminal. It required Thurston to post notices of em-

ployment opportunities, to survey its black employees as to job interests, and to provide detailed job descriptions for purposes of application and evaluation. The decree required the company to make periodic reports for two years about its implementation of the decree. The court afforded appropriate relief to the successful individual claimants. In addition, it awarded the plaintiffs $38,067.94 in attorneys' fees and expenses.

Thurston objects to both the imposition of the injunctive relief and the award of attorneys' fees. It argues that the decree is not supported by the evidence and that the fee award is an abuse of discretion.

█ Section 2000e–5(g) of 42 U.S.C. provides specifically for injunctive relief upon a finding of intentional discrimination in employment. We have upheld the court's findings of discrimination on the basis of race. Consequently, the decree was an appropriate exercise of the court's discretion. It must be modified, however, to delete reference to initial job placement and to conform to our dismissal of Crawford's claims.

█ The court required detailed information about the claim for attorneys' fees. It followed appropriate guidelines to determine the award and reduced the amount the plaintiffs claimed. We find no abuse of discretion. Nevertheless, because of our decision pertaining to Crawford's claims and initial hiring, the district court must reconsider the award in the light of *Hensley v. Eckerhart,* —— U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The plaintiffs, having substantially prevailed in this court, are entitled to an additional fee for services on appeal which the district court should determine on remand. They are also entitled to costs on appeal to be taxed by the clerk.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

WIDENER, Circuit Judge, concurring and dissenting:

I concur in the opinion of the court except that part with respect to the discharge of James Williams, and as to that I respectfully dissent.

There simply is no evidence in the record at all that Williams' discharge was motivated either by his race or by his filing discrimination charges with the EEOC in July and October of 1976, for which he received a right to sue letter in February 1977. Absent any other evidence, as is the case here, the mere fact that Williams had filed the charges in 1976 and was discharged in 1978, a year and a half later, cannot support an inference that the reason for the discharge was the filing of the charges.

The facts concerning the removal of the out of service tag from the trailer involved are without contradiction in the record. Taken most favorably to Thurston, they show that Williams removed the tag. Taken most favorably to Williams, they show that Thurston thought, with good reason, that Williams removed the tag. Neither inference which may be drawn from these facts has anything to do with race or filing charges with the EEOC.

It is thus my opinion that the findings of fact with respect to Williams' discharge are clearly erroneous.

JAMES DICKSON PHILLIPS, Circuit Judge, specially concurring:

I concur in the result and in all of the majority opinion's painstaking factual and legal analysis. I write separately only to emphasize my basis for concurring in the affirmance of the district court's finding that James Williams' discharge was discriminatorily motivated.

The factual issue on which that finding was based was, in my view, an exceedingly close one. As the majority opinion points out, it turned finally on credibility determinations. Williams testified—without any direct or circumstantial corroboration—that he did not remove a tag whose removal, or assumed removal, was the specific reason (and a justifiable one if accepted) articulated by Thurston for his discharge. Thurston's witness offered circumstantial evidence—the tag in the wastebasket and the

benefit to Williams from its removal—to suggest that Williams had removed it or that, in any event, Thurston assumed in good faith that he had.

To find as it did on this claim, the district court had perforce to reject as pretextual—as false—Thurston's fall-back assertion that whatever the fact of the matter, Thurston acted on a reasonable assumption that Williams had removed the tag, not merely that he had removed it. The finding then turned on a dual credibility determination: that Williams' testimony that he had not removed the tag was true and that Thurston's testimony about its state of mind (and possibly of the specific wastebasket episode) was false. On the underlying issue to which this conflicting testimony was addressed—Thurston's state of mind—the burden of persuasion was on Williams.

As the majority opinion axiomatically observes, this dual credibility determination was one "peculiarly within the province of the trier of fact". We review it, as we do all factual findings, under the clearly erroneous standard of Fed.R.Civ.P. 52(a), and under the special command of that rule to give "due regard ... to the opportunity of the trial court to judge of the credibility of witnesses."

Under that standard and that special command, I agree with the majority opinion that the district court's dispositive credibility determination here—simply accepting Williams' testimony and rejecting Thurston's—was not clearly erroneous. I write only to say that I do not consider that our task in review of such a determination begins and ends with recognition that the trial court had an opportunity denied us to observe the conflicting witnesses' demeanors. For "[c]redibility involves more than demeanor and comprehends an overall evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence". 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2586, pp. 736–37 (1971). This being so, our review requires an assessment of whether a given credibility determination is

made rationally suspect—to the point of suggesting a clearly erroneous process—by considering the evidence in its totality, or by taking judicial notice of incontestable conflicting fact, or by taking proper account of the cast of the burden of persuasion on the fact in issue.

Here, I am frank to say that, looking to the conflicting evidence alone and considering the cast of the burden of persuasion, I would be hard put as trier-of-fact to find by a preponderance of the evidence that Thurston's proffered reason for Williams' discharge was pretextual, i.e. false or "phony." But looking beyond the bald conflicting testimony on the point, there is nothing in the record which makes internally suspect to a reviewing court the process by which the trial court accepted Williams' testimony about the historical fact and rejected Thurston's testimony about its state of mind based upon an assumption concerning that fact.

Here witness demeanor, which we cannot assess, may well have made it completely rational in light of the whole record to determine that one witness was telling the truth while the other was either consciously lying or, in the occasional way of mankind, shading the truth ever so slightly. To the extent corroboration of the one version or the other is available in other evidence of record, there is only the evidence tending to corroborate Williams' version: that Thurston was engaged at the time in a general pattern or practice of discrimination of which this episode, as contended by Williams, was of a piece. *Cf. Miller v. Mercy Hospital,* 720 F.2d 356 (4th Cir.1983) (credibility determination respecting individual act of discrimination not supportable in light of whole record which revealed, *inter alia,* no general pattern of discrimination). Under these circumstances, I think we must defer to the superior "opportunity of the trial court to judge the credibility of witnesses" by observing their demeanors and otherwise exercising a feel for the case not possible in review.

By writing on this point, I do not suggest that the majority opinion implies anything

to the contrary. My purpose is only to emphasize points respecting review of credibility determinations that I believe bear emphasis from time to time, particularly in litigation contexts such as that here that frequently boil down to head-on "swearing contests" between the principal party-witnesses.