Curtis **GILKEY**, Plaintiff,

v.

**CENTRAL CLEARING CO.,**
**et al, Defendants.**

No. 00–71852.

United States District Court,
E.D. Michigan,
Southern Division.

July 30, 2001.

Steven E. Goren, Goren & Goren, Bingham Farms, MI, Daniel A. Edelman, Edelman, Combs, Chicago, IL, for plaintiff.

Jeffrey I. Fried, Fried & Morse, Southfield, MI, Louis J. Porter, Cook, Goetz, Bloomfield Hills, MI, Robert E. Rochford, Winne, Banta, Hackensack, NJ, for defendants.

### *OPINION AND ORDER GRANTING IN PART, AND DENYING IN PART, PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION*

ROBERTS, District Judge.

### I. *Introduction*

This consumer fraud case is before the Court on Plaintiff Curtis L. Gilkey's Renewed Motion for Class Certification.[1] For the reasons stated below, the Court will grant Plaintiff's Motion, with one exception: the Court will not grant class action status of the issue of actual damages with respect to Plaintiff's Truth in Lending Act ("TILA") claim.

### II. *Background*

Plaintiff brings this action against Central Clearing Co./Cash Now, Inc., Partners, Limited Partnership, d/b/a Cash Connection. Plaintiff's Complaint concerns the legality of "payday loan" transactions as they were structured by Cash Connection. Plaintiff acquired four such payday loans from May 1999 until January 2000. The specific ques-

tion is whether check cashing fees that were included in the transactions should be considered finance charges and/or interest.

In his Complaint, Plaintiff describes payday loans as follows:

8. 'Payday loans' are short term, very high interest rate loans. The loans are typically two weeks in duration and have actual annual percentage rates of over 300%. At the end of the two week term, the customer has the option of continuing the loan for an additional period by paying the interest. The loans are typically 'rolled over' on multiple occasions.

9. 'Payday loans' are generally made to consumers facing financial emergencies. Once a consumer obtains a 'payday loan,' he or she will often be unable to pay it off except from the proceeds of additional 'payday loans.'

(Cmpt. at 3).

Plaintiff's first payday loan was taken out on May 20, 1999. The Consumer Credit Disclosure—Promissory Note regarding that loan is attached to Plaintiff's Complaint at Exhibit A. According to the Note, Plaintiff's loan had an "annual percentage rate" of 4.9932% and a "finance charge" of 57¢. The "amount financed," described as "the amount of credit provided to you or on your behalf," was listed as $297.62. Yet, farther down, the Note reveals that Plaintiff only received $250.00 as a cash advance. Further down still, the discrepancy between the amount financed and the amount Plaintiff actually received is finally explained: "It is specifically agreed and understood that the Borrower is paying a check cashing charge of $16.00 per hundred of the face amount of any Payday Advance check which is submitted to Cash Connection."

The Promissory Note does not specifically state it, but a post-dated check is required to be paid to Cash Connection before any of the loan proceeds are disbursed. The only clues regarding that requirement are (1) in a Notice to Borrower, Cash Connection warns

---

1. The August 22, 2000 Motion for Class Certification was denied without prejudice so as to allow the parties to undertake some discovery. Following that discovery, the Renewed Motion was filed on April 30, 2001.

that a $10.00 fee will be imposed if any check is returned for insufficient funds; and (2) the Note indicates that the debt has been "Paid: Subject to check number 203 clearing." And, while the Note does not clarify it, both parties agree that the check must be post-dated for the "Payment Due" date provided on the Note. With respect to the May 20, 1999 Note, the due date was June 3, 1999. Accordingly, Plaintiff, who made a total payment of $298.19, paid a total of $48.19 for the benefit of receiving a cash advance of $250 for a two week period and, supposedly, for having his check to Cash Connection cashed.

Except for the amounts filled in, the Promissory Note dated June 18, 1999 is the same as the May 20, 1999 Note. The annual percentage rate was 4.9274%, the finance charge was 45¢, the amount financed was $238.10 and his total payments were $238.55. Yet, Plaintiff received only $200.00 as a cash advance (Cmpt. at Exh. B). Similarly, on December 27, 1999, Plaintiff received a cash advance of $150, but made a total payment of $178.74. The finance charge was nonetheless listed as only 17¢. Plaintiff's final loan, dated January 20, 1999, was identical to his first; he received a cash advance of $250 after making a post-dated check out to Cash Connection for $298.19.

Plaintiff's payday loan transactions were consistent with Defendants' standard practices. According to Allen Franks, President of Cash Now, Inc., each of Defendants' stores charges the same standard check-cashing fee, which is $16 per $100 of the amount borrowed. (*Plt's Br.*, Ex. G at 17 & 32). The payday loans may only be paid by check, which must be postdated for the customer's next pay day (but no longer than two-weeks following the loan). (*Id.* at 51–52 & 65, and Ex. F at 2). That post-dated check must include the check-cashing fee. (*Plt's Br.*, Ex. G at 73).[2]

Plaintiff complains that the payday loans in question violated the Michigan Consumer Protection Act ("MCPA") and TILA, and asserts his claims on his behalf and that of a putative class.

**2.** Franks denied that customers are permitted to "rollover" their loans, i.e., make a partial payment on a loan and carry the balance for another two weeks. (*Plt's Br.*, Ex. G at 65). Plaintiff

### III. *Applicable Law and Analysis*

The question of whether to grant a motion for class certification must be answered by reference to Fed.R.Civ.P. 23.

### IV. *Analysis*

Before turning to the specific Rule 23 factors that must be analyzed, the Court must quickly dispose of some of Defendants' arguments.

■ Defendants argue that Plaintiff's MCPA usury claim is not recognized by Michigan law and that Plaintiff's claims are barred by the MCPA because state administrative bodies have sanctioned Defendants' practices. These arguments are not properly made here. "[W]hen determining the maintainability of a class action, the district court must confine itself to the requirements of Rule 23 and not assess the likelihood of success on the merits." *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, (6th Cir.1974). To so state, the *Weathers* court relied upon *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177–178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), which held:

> We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.... In short, we agree with Judge Wisdom's conclusion in *Miller v. Mackey International*, 452 F.2d 424 (C.A.5 1971), where the court rejected a preliminary inquiry into the merits of a proposed class action:
>
> 'In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.' *Id.*, at 427.

Accordingly, this analysis will address the Rule 23 factors and not the merits of Plaintiff's claims. The Court is first required to analyze each of the Rule 23(a) factors.

alleged in his Complaint that rollovers were frequent, but appears to now be dropping that allegation.

Those factors are commonly referred as (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. The Court must whether class certification is warranted pursuant to Rule 23(b)(3).

### A. Numerosity

■ The numerosity requirement is found in Rule 23(a)(1). It requires the class to be "so numerous that joinder of all members is impracticable." Although there is no magic number that determines when joinder of all members would be impracticable, "[w]hen class size reaches substantial proportions ... the impracticability requirement is usually satisfied by the numbers alone." *American Medical Systems* at 1079.

´ [3] At the stage of the proceedings in which class certification is being considered, it is not necessary for the Court to know the precise number of class members. Instead, the Court may rely upon reasonable inferences drawn from the known facts. *American Medical Systems* at 1079.

■ The Court finds that Plaintiff meets the numerosity requirement. To support his claim that he meets the numerosity requirement, Plaintiff relies upon the 200 loan disclosures from one month of each year Defendants produced and the fact that the Promissory Notes are standard printed forms. (*Plt's Appendix*). In opposition, Defendants rely upon the affidavit of Martin W. Wing, Ph.D., to demonstrate that the class numbers are dwindling. Dr. Wing opines that the arbitration agreements that have been included in Defendants' standard forms since March of 2000 have reduced the class by about 53.6%. Notwithstanding, he also states that the potential class at the time he signed his June 18, 2001 affidavit numbered 4383. (*Dft's Br.*, Ex. 5 at ¶¶ 4–6).

Assuming that Dr. Wing's numbers are accurate, his affidavit serves to support, rather than refute, that Plaintiff meets the numerosity requirement. Even if the class at issue here continues to decline, it is highly unlikely that it will be reduced below that which has been found sufficient. Class sizes that are dramatically smaller than that at issue here have been held to suffice. In fact, circuit precedent has recognized class certification in classes with as few as eighteen members, [*Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) ], (*citing Cypress* [*v. Newport News General and Nonsectarian Hospital Ass'n*, 375 F.2d 648, 653 (4th Cir.1967) ](eighteen members)), and that a class of as few as twenty-five to thirty members raises a presumption that joinder would be impracticable. *In Re Kirschner Medical Corporation Securities Litigation*, 139 F.R.D. 74, 78 (D.Md.1991) (*citing Dameron v. Sinai Hospital of Baltimore, Inc.*, 595 F.Supp. 1404, 1408 (D.Md.1984)). *Rodger v. Electronic Data Systems Corp.*, 160 F.R.D. 532, 535–536 (E.D.N.C.1995). In *Brady, supra.*, the court held that "74 persons is well within the range appropriate for class certification." *Brady* at 145.

Accordingly, the Court finds that Plaintiff has met the numerosity requirement of Rule 23(a)(1).

### B. Commonality

■ Rule 23(a)(2) mandates that, in order for a class to be certified, there must be "questions of law or fact common to the class." When the legality of the defendant's standardized conduct is at issue, the commonality factor is normally met:

Where a question of law refers to a standardized conduct of the defendants toward members of the proposed class, a common nucleus of operative facts is typically presented, and the commonality requirement of Rule 23(a)(2) is usually met.... [A] lack of identical factual situations will not necessarily preclude certification where the class representative has shown sufficient common questions of law among the claims of the class members.

*Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D.Ill.1984). In accord, the court in *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) stated: "Common nuclei of fact are typically manifest where, like in the case *sub judice*, the defendants have engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents."

### 1. The Common Issues

■ In this case, Plaintiff is seeking class certification on the issues of whether Defen-

dants' standard payday loan practice violates the MCPA and TILA by charging a check cashing fee that should be disclosed as part of the finance charge. Defendants' liability under those statutes does not require individual analysis.

■ With respect to the MCPA, the court in *Dix v. American Bankers Life Assurance Co. of Florida*, 429 Mich. 410, 418, 415 N.W.2d 206 (1987), specifically held that class certification of claims under the Act are warranted because:

> members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentation. It is sufficient if the class can establish that a reasonable person would have relied on the representation. Further, a defendant's intent to deceive through a pattern of misrepresentations can be shown on a representative basis under the Consumer Protection Act.

■ Similarly, where a defendant has failed to make the disclosures required under TILA, there is no requirement that the plaintiff show that he/she was misled:

> All TILA disclosures must be accurate, *Gibson v. Bob Watson Chevrolet–Geo, Inc.*, 112 F.3d 283, 285 (7th Cir.1997), and lenders are generally strictly liable under TILA for inaccuracies, even absent a showing that the inaccuracies are misleading, *Brown v. Marquette Savings and Loan Assoc.*, 686 F.2d 608, 614 (7th Cir. 1982).

*Smith v. Cash Store Management, Inc.*, 195 F.3d 325, 328 (7th Cir.1999). Among disclosures that the TILA requires is the "finance charge" and the "annual percentage rate." 15 U.S.C. § 1638(a)(3) and (4). These are items that Plaintiff claims were inaccurately disclosed on Defendants' standard Promissory Note. Hence, if Defendants' standard form was inaccurate, they are strictly liable without any analysis of whether Plaintiff or any other class member was misled.

■ Defendants argue that the commonality test has not be made here because "individual questions abound." In so arguing, Defendants ignore that, to meet the commonality test, " 'there need be only a single issue common to all members of the class.' " *American Medical Systems* at 1080, quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.10, at 3–47 (3d ed.1992). "Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988).

Here, there are common issues that apply to all class members. The fact that there may be some remaining individual issues does not deem class certification inappropriate.

### 2. The Arbitration and Release Provisions

■ Furthermore, some of the "individual issues" Defendants cite are not really individual. Defendants cite the "foremost" individual issue as being the arbitration provision in the standard forms that have been used since March 2000. The arbitration provision issue, however, would not require individual analysis. Rather, it could be resolved for the subclass who signed the newer form. "[A] class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly." Rule 23(c)(4)(B).

■ In order to defeat the arbitration clause, subclass members would be required to show that arbitration costs would be prohibitive. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (holding, "[W]here, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs.").[3] This

---

3. The *Green Tree* plaintiff was unable to demonstrate that she would sustain arbitration costs because the contract she signed was silent about the procedures that would be followed and there was some evidence that consumers do not al-

ways have to pay the usual arbitration costs. In contrast, the putative subclass here may be able to demonstrate that its members would sustain prohibitive arbitration costs. The arbitration provision at issue specifies that the American Ar-

issue could be resolved for the entire sub-class in one motion. Consequently, the fact that some class members signed the arbitration clause should not be found to defeat class certification.

The same analysis applies to Agreement to Release Cash Connection. The release is featured in the same Promissory Notes that includes the agreement to arbitrate. Thus, the release issue pertains to the same subclass for which the arbitration issue is relevant. Whether the releases were effective can be resolved in one motion.[4]

### 3. The Incorporation of the Check Cashing Fee

Should the putative subclass succeed in defeating the arbitration and release clauses, there is another reason that the Court may ultimately decline to hear the subclasses' claims. The TILA and MCPA claims of the subclass may be similar, but they are not identical to Plaintiffs'. With respect to the subclass, Defendants have adopted the practice of incorporating the check cashing fee into the Annual Percentage Rate and Finance Charge. (*Plt's Br.*, Exs. B, C, & D). Thus, in the newer Promissory Notes attached to Plaintiff's Motion, the Annual Percentage Rate is identified as being 501.6%, 777.4% and 1163.6%. (*Id.*) Additionally, the disclosed Finance Charges are from $38 to $47. (*Id.*) Previously, the Annual Percentage Rate was always listed as being below 5%, and the Finance Charges were well below $1.

Nonetheless, despite incorporating the check cashing fee into the Annual Percentage Rate and Finance Charges, Defendants' current practice may still be violative of TILA or the MCPA. Defendants' form still states under the Finance Charge, "I hereby agree to repay at the rate of 5% per annum." Adding to the confusion is that, in the Uncon-

ditional Promise to Pay provision of the form, the check cashing fee is segregated from the interest and annual percentage rate:

> For value received, the undersigned ('Borrower') promises to pay to Cash Connection # 43 ('Creditor'), the principal amount of Two Hundred Thirty Eight and $^{48}/_{100}$ Dollars ($200 and $.38 of interest on the unpaid principal balance at a rate per annum of five percent (5%) until maturity and on the unpaid balance at a rate of seven percent (7%) after maturity). It is specifically understood and agreed that the Borrower is also paying a check cashing charge of $16 per hundred of the face amount of any Payday Advance check which is submitted to Cash Connection # 43 for any Payday Advance.

*(Plt's Br.*, Ex. B).[5]

Curiously, the previous version of the form—the one Plaintiff signed—did not include the Unconditional Promise to Pay provision. Thus, at the same time that Defendants started to incorporate the check cashing fee into the Annual Percentage Rate and Finance Charge in one part of the form, they segregated it in another portion.

Neither Plaintiff nor Defendants really address these changes when making their commonality arguments. When addressing the newer forms they use, Defendants argue only that the arbitration and releases contained in the new form defeat commonality. And, in his Reply, Plaintiff states in conclusory fashion:

> The Court may also create a subclass of those individuals who signed a loan form that includes the check cashing fee in the calculation of the APR and amount financed. *See Exhibit A.* However, there is still a question as to whether the check

---

bitration Association in Southfield would be the arbitrators, and that the fees would be split equally between the parties. (*Plt's Br.*, Ex. C).

4. Note that at least two courts have held general releases of TILA claims to be void as against public policy. *Parker v. DeKalb Chrysler Plymouth*, 673 F.2d 1178, 1181 (11th Cir.1982)("If these private attorneys general are permitted to waive TILA claims in circumstances such as those presented in this case, the public interest in

deterring inconsistent and undecipherable lending practices would be greatly hampered."); *Buford v. American Finance Co.*, 333 F.Supp. 1243, 1248–1249 (N.D.Ga.1971)(holding that releases were "null and void" because they would thwart the legislative intent of arming private attorneys general to enforce TILA).

5. Plaintiff's Exhibits C and D have the same language, except that the amounts of principal and interest are different.

cashing fee is usurious interest that is not disclosed.

(*Plt's Rep.* at 7).

■ Because of the lack of briefing on this issue, the Court is unable to determine whether Defendants' customers who signed the newer form have a common issue with Plaintiff. However, a final decision on this issue need not be made at this juncture. Under Rule 23(c)(1), an order granting class action status "may be conditional, and may be altered or amended before the decision on the merits." Thus, the Court conditionally finds that Plaintiff has met the commonality requirement with respect to the putative subclass.[6]

\* \* \*

In conclusion, the Court finds that Plaintiff has met the commonality requirement with respect to those members of the class who used the same form as he, and conditionally find that the commonality requirement has been met with respect to those subclass members who signed a form in which the check cashing fee was incorporated into the Annual Percentage Rate and Finance Charge, but segregated in the Unconditional Promise to Pay provision.

## C. *Typicality*

■ The Court finds that Plaintiff has met the typicality requirement. The typicality factor is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(3). "The test for typicality, like commonality, is not demanding . . . ." *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993). Typicality may be presumed when the plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members." *American Medical Systems* at 1082, *quoting* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 3.13, at 3–76 (3d ed.1992).

■ In this case, Plaintiff's claims arose from Defendants' practice of segregating its check cashing fee from the Annual Percentage Rate and Finance Charge. This is the practice that underlies the common issues previously cited.

The Court finds Defendants' argument that Plaintiff is atypical of the class unavailing. Defendants' emphasis on the fact that Plaintiff was unemployed and on social security disability at the time he took out his loan is simply irrelevant to the issue of whether they disguise usurious interest by calling it a check cashing fee.

Defendant additionally makes irrelevant arguments that Plaintiff is atypical of the class he described in his Complaint. They cite the portions of his Complaint in which he states that payday loans are typically rolled over, and note that Plaintiff testified that he did not roll over his loans. (However, the evidence has revealed that Defendants do not allow any customers to roll over their loans, so Plaintiff is typical of Defendants customers on the roll over issue.) Defendants cite the allegations in Plaintiff's Complaint that customers often must pay off their payday loans with the proceeds of additional such loans and that payday loan customers are often facing financial emergencies and assert that Plaintiff denied having these circumstances apply to him. Finally, in his request for relief, Plaintiff requests, on behalf of the class, the cancellation of all balances due. Yet, Defendants argue, Plaintiff owes no balance. Since none of the distinctions Defendants' raise have any bearing on whether Plaintiff is typical with respect to the central legal issues he seeks class certification of, Defendants' claim that Plaintiff is atypical should be rejected; the Court should find that Plaintiff has met the typicality requirement.

## D. *Adequacy of Representation*

■ Pursuant to Rule 23(a)(4), a class may be certified only if "the representative

**6.** Defendants make two other arguments to refute that the commonality requirement is met. They argue that the presence of compulsory counterclaims against some class members and Plaintiff's claim that the checks represent undisclosed security interest defeat commonality. However, I believe that those issues are more appropriately addressed under Rule 23(b)(3); those issues address whether the common issues predominate over individual issues. Accordingly, I will address these issue *infra.*

parties will fairly and adequately protect the interests of the class." "This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members." *American Medical Systems* at 1083.

■ The adequacy of representation factor requires the Court to consider two criteria: "1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir.1976). *Accord, American Medical Systems* at 1083.

■ Regarding the qualifications of his counsel, Plaintiff directs the Court to the Declarations of Steven E. Goren and Daniel A. Edelman. (*Plt's Br.*, Ex. H). According to their Declarations, both counsel have extensive experience. Of particular relevance is Goren's indication that he was an organizer and speaker in a June 3, 2000 seminar entitled, "Consumer Class Actions: Challenging Business Misconduct." Similarly, Edelman and his partners are authors of several publications concerning consumer class actions and consumer fraud. Edelman additionally declares that "[v]irtually all of his practice involves litigation on behalf of consumers."

In reviewing various decision of other courts, this Court noticed, too, that the Edelman firm has representing many plaintiffs in other cases raising class action issues. A search of opinions regarding class action litigation in which that firm was involved revealed 127 opinions. Ten of those opinions dealt specifically with cases involving payday loans. It thus appears that Plaintiff's counsel are not only competent, but are leading experts in this field.

It is, furthermore, apparent that Plaintiff's counsel is vigorously pursuing this action.

■ The Court finds that there is no indication that Plaintiff's interests are in conflict with that of the class. Defendants argue that Plaintiff has waived his defense of usury by paying off his loan. It is true that "[t]he basic rule in Michigan is that usury is a defense and that there is no right to repayment of usurious interest by means of an independent action." *Thelen v. Ducharme*,

151 Mich.App. 441, 449, 390 N.W.2d 264 (1986). Nonetheless, Plaintiff's state claim is made pursuant to the MCPA, which authorizes private actions to challenge "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce ...." M.C.L. § 445.903. Plaintiff's claim is that Defendants have deceptively concealed the fact that they were charging usurious interest by charging a sham check cashing fee. Defendants offer no argument that Plaintiff has waived his MCPA claim.

Furthermore, the rule enunciated in *Thelen* that usury is a defense rather than an independent cause of action applies to all of the class members. In other words, Plaintiff's inability to bring an independent cause of action in usury does not deem him atypical of his class.

■ Defendants also argue that Plaintiff may not be sufficiently knowledgeable to advocate on behalf of his class because he did not know that payday loans may not be rolled over. The Court finds that Plaintiff's prior lack of knowledge regarding this collateral matter is irrelevant to the issue of whether Plaintiff is an adequate representative of his class.

■ Another argument advanced by Defendants is that Plaintiff does not meet the statutory requirements for a class representative under the MCPA because he testified that he did not rely upon the disclosures in the Promissory Note. They note that MCPA allows a "person who suffers loss as a result of a violation of this act" to bring a class action. Since Plaintiff did not rely upon the disclosures, he did not suffer a loss and cannot bring a class action, Defendants argue.

Defendants' argument is contrary to the liberal interpretation of the MCPA mandated by *Dix v. American Bankers Life Assur. Co. of Florida*, 429 Mich. 410, 417–418, 415 N.W.2d 206 (1987):

The Consumer Protection Act was enacted to provide an enlarged remedy for consumers who are mulcted by deceptive business practices, and it specifically provides for the maintenance of class actions. This remedial provision of the Consumer Protec-

tion Act should be construed liberally to broaden the consumers' remedy, especially in situations involving consumer frauds affecting a large number of persons.

We hold that members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations. Further, a defendant's intent to deceive through a pattern of misrepresentations can be shown on a representative basis under the Consumer Protection Act. So construing the Consumer Protection Act should obviate some of the practical difficulties that Freeman envisioned when an action is brought on a common-law fraud theory.

■ Furthermore, a "loss" under the MCPA "does not require injury to the plaintiff's pocketbook. Instead, the injury may consist in the plaintiff's unfulfilled expectations." *Mayhall v. A.H. Pond Co., Inc.,* 129 Mich.App. 178, 183, 341 N.W.2d 268 (1983). In other words, an injury under the MCPA is found when "the victim does not receive what he expected to receive." *Id.* at 185, 341 N.W.2d 268.

In this case, the Promissory Notes Plaintiff signed indicated that he was receiving loans at Annual Percentage Rates of about 5%. It is Plaintiff's claim that that is not what he received. Therefore, Plaintiff may be able to prevail on his claim that he suffered an injury pursuant to the MCPA.

\* \* \*

In conclusion, the Court finds that Plaintiff has met the requirements of Rule 23(a).

**E.   *Rule 23(b)(3)***

■ After fulfilling the Rule 23(a) factors, a party seeking class certification must also demonstrate that the class falls into one of the categories listed in Rule 23(b). Plaintiff herein relies upon Rule 23(b)(3), which requires that:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudi-

cation of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The Court finds that Plaintiff's proposed class meets the requirements of Rule 23(b)(3), except with respect to the issue of actual damages under TILA.

**1.   This is a classic Rule 23(b)(3) claim**

In *Roper v. Consurve, Inc.,* 578 F.2d 1106, 1112 (5th Cir.1978), the court found the case before it as representing a classic Rule 23(b)(3) case:

This is a classic case for a Rule 23(b)(3) class action. The claims of a large number of individuals can be adjudicated at one time, with less expense than would be incurred in any other form of litigation. The claims are relatively small, said even by the plaintiffs to average less than $100 each, and the question of law is one that applies alike to all. While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance. It will not be necessary to hear evidence on each claim.

A number of similar class actions have been certified by district courts, and appear to have been susceptible of management. Certification will achieve one of the primary purposes of the class action, 'enhanc(ing) the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture.' *Hawaii v. Standard Oil Co. of California,* 1972, 405 U.S. 251, 266, 92 S.Ct. 885, 893, 31 L.Ed.2d 184.

Likewise, in *Lake v. First Nationwide Bank,* 156 F.R.D. 615, 626 (E.D.Pa.1994), the court

noted, "Given the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action."

As in *Roper* and *Lake,* the class at issue involves a large number of potential litigants with only a small amount of potential recovery for each. Under TILA, statutory damages for an individual action are only twice the amount of the finance charges involved in the transaction. 15 U.S.C. § 1640(a)(2).[7] Thus, an individual action would result in a statutory award of less than $100 per transaction.[8]

■ Individuals may also recover actual damages under TILA, § 1640(a)(1), but only after demonstrating reliance. "The legislative history emphasizes that TILA provides for statutory remedies on proof of a simple TILA violation, and requires the more difficult showing of detrimental reliance to prevail on a claim for actual damages." *Turner v. Beneficial Corp.,* 242 F.3d 1023, 1028 (11th Cir.2001). "Actual damage is thus sustained as a result of a failure to disclose under the statute if a consumer can show that, had he been properly informed, he would have engaged in a different or less-expensive transaction." *Perrone v. General Motors Acceptance Corp.,* 232 F.3d 433, 436 (5th Cir.2000). Consequently, in most cases, actual damages are nonexistent or difficult to prove. *Turner* at 1028.

Such difficulty to prove actual damages will certainly be present in this case. This is not a case where customers have been surprised by the total amount of their debt because finance charges were hidden. Defendants' customers prepaid their loans, including the check cashing fee, and thus knew the extent of their debt at the onset. Like most TILA plaintiffs, the class in this case will, therefore, be unlikely to recover any more than their statutory damages. As noted in *Lake, supra.,* in view of the less than $100 available to each class member per transaction, a class action lawsuit is likely the

only means by which Defendants' alleged violations will ever be addressed.

Plaintiff's damage claims under the MCPA are also limited. Under the MCPA, "[e]xcept in a class action, a person who suffers loss as a result of a violation of this act may bring an action to recover actual damages or $250.00, whichever is greater, together with reasonable attorneys' fees." M.C.L. § 445.911(2). *In Mayhall v. A.H. Pond Co., Inc.,* 129 Mich.App. 178, 185, 341 N.W.2d 268 (1983), the court described actual damages as comprising of "the difference between the actual value of the property when the contract was made and the value that it would have possessed if the representations had been true."

In this case, if the representations that the Annual Percentage Rate on the Promissory Notes was about 5% were true, the class members would have paid some $37 to $46 less for each payday loan. A class member would be better off opting for the $250 in statutory damages than his/her actual damages. And, that $250 in damages would be unlikely to compel an individual MCPA action against Defendants; vindication of the class members rights under the MCPA is likely to occur only by means of a class action.

In short, the Court finds that a class action, involving multiple small claims, is the preferred forum for Plaintiff's TILA and MCPA claims.

### 2. This case arises out of a single course of conduct

Notwithstanding the classic example of a Rule 23(b)(3) class action presented in *Roper,* a proposed class action need not be an aggregation of small claims in order to qualify under that subsection.

> The procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and

---

7. These statutory damages do not apply in class actions. Section 1640(a)(2)(B).

8. This estimation is based upon the fact that, when the check cashing fee is incorporated into

the finance charge in the newer Promissory Notes attached to Plaintiff's Motion, the changes ranged from $38 to $47. (*Plt's Br.,* Exs. B,C & D).

expense. However, the problem of individualization of issues often is cited as a justification for denying class action treatment in mass tort accidents. While some courts have adopted this justification in refusing to certify such accidents as class actions, numerous other courts have recognized the increasingly insistent need for a more efficient method of disposing of a large number of lawsuits arising out of a single disaster or a single course of conduct. In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

*Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1196–1197 (6th Cir.1988) (citations omitted).

Although this case does not arise out of a mass tort accident, the *Sterling* court's reasoning is apropos here. In certifying a class in another TILA case regarding payday loans, the court in *Van Jackson v. Check 'N Go of Illinois, Inc.*, 193 F.R.D. 544 (N.D.Ill. 2000), rejected the defendants' argument that individual issues would make management of the class action difficult by stating:

> I appreciate the defendants' concern about my caseload, but I would much rather handle this case as a class action than try hundreds of individual claims. See American Pipe & Construction Co. v. Utah, 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) ('[E]fficiency and economy of litigation ... is a principal purpose of the procedure.').

### 3. Compulsory Counterclaims

▌ The Court finds that common issues predominate over individual issues in this case despite Defendants' argument that it would have compulsory counterclaims against some of the class members. Without providing any estimation of how many, Defendants argue that there are proposed class members who have defaulted on their payday loans. Those in default either have executed settlements with releases, have judgments against them, have actions pending against them, or are individuals Defendants plan to sue. The presence of these individual issues would predominate over the common claims at issue.

In *Heaven v. Trust Co. Bank*, 118 F.3d 735 (11th Cir.1997), the court affirmed the trial court's decision to deny certification due to the presence of compulsory counterclaims. The plaintiff's claims involved alleged violations of the disclosure obligations found in the Consumer Leasing Act. The defendant counterclaimed that individual class members had defaulted on their lease agreement and/or made false statements on their applications. In denying class certification, the court reasoned that the counterclaims were compulsory[9]; that the counterclaims at issue would require the court to engage in multiple separate factual determinations; that the cost to individual class members of having to defend themselves against the counterclaims could exceed the statutory damages they may recover; and that subclassification would not resolve these complications. *Heaven* at 738.

Importantly, the *Heaven* court emphasized that it was not ruling that as a matter of law, class certification is improper where counterclaims may be raised. Indeed, it stated, "[i]f this panel had faced the class certification issue in the first instance, we may well have found it appropriate to certify the class or to establish subclasses." *Id.* at 739. The court's affirmation was based on its finding that the district court had not abused its discretion in considering the presence of the compulsory counterclaims:

> We do not intend to suggest that compulsory counterclaims should preclude the maintenance of class actions in cases under the CLA as a general rule. We rule only that it is a proper exercise of discretion for

9. The Eleventh Circuit holds that debt counterclaims are compulsory under in TILA and Consumer Leasing Act claims. *Heaven* at 738.

the district court to evaluate the nature of the counterclaims and the difficulties they present and to consider the usefulness of breaking the proposed class into subclasses to avoid those difficulties.

*Id.* at 739, n. 7.

In contrast, the *Roper* court held that the district court had abused its discretion when it denied class certification based, in part, upon potential counterclaims. It reasoned, forcefully, that counterclaims against a few class members should not be allowed to defeat the ability of the remaining to take advantage of the benefits of class certification and meaningfully address violations of federal law.

> The lower court alluded to the potential problem of counter-claims. This likewise can be handled, if that point is reached, by adopting standards and classifying the claims. *See Weit v. Continental Illinois Nat'l. Bank,* N.D.Ill.1973, 60 F.R.D. 5. If the court should conclude at any time that the entire group of counter-claims makes the plaintiffs' claims on behalf of such persons unmanageable, the court has the continuing authority under Rule 23 to issue a supplemental order excluding counterclaim defendants from the plaintiff class or separating and severing the class into two different classes, one with counter-claims and one without counter-claims. As Judge Johnson said in Partain, supra:
>
>> The potential assertion of counter claims against these few members of the proposed class cannot be allowed to defeat an otherwise valid class action when to do so would effectively deprive thousands of class members of the relief to which they are entitled. At the same time the rights of the defendant should be protected.
>
> 59 F.R.D. at 59.

Of course, the easiest way for any court to handle complex class litigation is simply to deny certification; this may have the real effect of permitting a defendant to violate a federal statute either with impunity or minor expense. In the present case few of the individual claimants would have the resources necessary to litigate against a well-financed defendant. This consideration underlies the decision of the Seventh Circuit in *Hohmann v. Packard*

*Instrument Co.,* 7 Cir.1968, 399 F.2d 711, which found a similar situation a classic one for sustaining the class action involved. Quoting its prior decision in *Weeks v. Bareco Oil Company,* 7 Cir.1941, 125 F.2d 84, 90, the court said:

> To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit practice was to prevent.

399 F.2d at 715.

*Roper* at 1116.

The *Heaven* court acknowledged *Roper,* but distinguished it from the case before it, stating:

> In *Roper,* the district court based its decision to deny class certification on the mere possibility that the defendant would assert counterclaims. The district court could not have known the nature of such counterclaims because none had been filed. The former Fifth Circuit held that denial of class certification based on speculation regarding the potential assertion of counterclaims was an abuse of discretion. *Roper,* 578 F.2d at 1116. In this case, the district court below engaged in no such speculation.

*Heaven* at 738.

In accordance with *Heaven,* also see *Carter v. Public Finance Corp.,* 73 F.R.D. 488 (N.D.Ala.1977). The court in that TILA case denied class certification upon reviewing evidence that 85 of the 383 were in default of their finance contracts with the defendant. "This means that instead of conducting one trial, the court in a class action would probably be conducting 86 separate trials, the class action and 85 counterclaims against individuals. To this court, such a situation creates 'difficulties ... in the management of a class action,' Rule 23(b)(3)(D)." *Id.* at 490.

The Court will follow *Roper* and hold that the presence of potential compulsory counterclaims does not defeat the rights of the greater class to vindicate their rights as a class under the TILA and the MCPA. It is

reasonable to presume that, whenever a class seeks to challenge a standard lending practice, some class members will have defaulted on the loans in question. Since class members are unlikely to bring individual actions in light of the limited recovery available, the holdings of the district courts in *Heaven* and *Carter* will have the effect of insulating institutions such as Defendants from liability under the TILA and MCPA. Cutting off the rights of consumers to vindicate their rights is contrary to the intent of the TILA and MCPA to encourage private attorneys general. "[T]he public must rely largely on the efforts of individual consumers acting as 'private attorneys general' to achieve the disclosure system envisioned by the Act." *Parker v. DeKalb Chrysler Plymouth,* 673 F.2d 1178, 1181 (11th Cir.1982).

Furthermore, unlike in *Heaven* and *Carter,* Defendants have failed to do anything more than raise the potential for compulsory counterclaims. While it is certainly likely that some class members have defaulted, Defendants do not provide any basis for the Court to estimate how many. Indeed, Defendant Franks stated in his affidavit that "the vast number of payday advances have been paid in full, including all interest and all check cashing fees." [10] (*Dft's Br.,* Ex. 3 at ¶ 5). Even the *Heaven* court suggested that a district court decision to deny class certification based upon speculative counterclaims would be an abuse of discretion. [11]

### 4. Postdated checks as security interests

▪ Another issue that Defendants state will require individual determination is Plaintiff's claim that the postdated checks represent security interest that is not disclosed on the Promissory Notes. Defendants contend that the issue of whether a security interest was created depends upon the intent of the individual parties to each transaction. The Court finds Defendants' argument to this effect to be without merit.

Regulation Z provides the definition of "security interest" applicable in TILA cases. " 'Security interest' means an interest in property that secures performance of a consumer credit obligation and that is recognized by state or federal law." 12 C.F.R. § 226.2(a)(25). The post-dated checks at issue secure the performance of the customers' obligation to pay their debts. Further, under Michigan law, Defendants are empowered to charge an additional fee for processing a dishonored check and/or to sue the maker of the dishonored check for twice the amount of the check or $100, whichever is greater. M.C.L. § 600.2952. Under the same circumstances, the court in *Van Jackson v. Check 'N Go of Illinois, Inc.,* 123 F.Supp.2d 1079, 1082 (N.D.Ill.2000), held that postdated checks are security interests under TILA:

> In this context, the postdated checks secure the performance of the borrowers' obligations to repay the payday loans, and that interest is recognized by state law in the form of the bad check statute and by federal case law in the form of *Smith [v. Cash Store Management, Inc.,* 195 F.3d 325 (7th Cir.1999)]. These checks are therefore security interests within the meaning of § 1638(a)(9).

Notably, this holding in *Van Jackson* was made without reference to the subjective intent of the parties involved.

*Shurlow v. Bonthuis,* 456 Mich. 730, 576 N.W.2d 159 (1998), the opinion upon which Defendants rely, is not contrary. That court noted, " '[T]he principal test whether a transaction comes under [Article 9 of the Uniform Commercial Code] is: is the transaction intended to have effect as security?' " *Id.* at 735, n. 735, 576 N.W.2d 159, *quoting* M.C.L. § 440.9102. However, to determine whether the transaction at issue was intended to have effect as security, the court objectively reviewed the lease at issue; there was no need for the parties to submit evidence regarding their subjective intent. The *Shurlow* court's

---

10. This statement was apparently made by Franks to support Defendants claim that class members have waived their usury defense.

11. Plaintiff argues that Defendants default claims would not be compulsory counterclaims, but

*Heaven* held to the contrary. *Heaven* at 738. I see no need for the Court to decide in this Motion whether Defendants' alleged compulsory counterclaims should be allowed, reserve that issue for a later date.

approach to determining what the parties intended was consistent with Michigan law that "the actual mental processes of the contracting parties are wholly irrelevant to the construction of contractual terms." *Zurich Ins. Co. v. CCR and Co.,* 226 Mich.App. 599, 604, 576 N.W.2d 392 (1997).

Consequently, the determination of whether the postdated checks at issue represented undisclosed security interests does not require any individual inquiries. Rather, that determination must be made by an objective view of the standard transaction that was used with respect to each member of the class.

### 5. Relief Requested

Defendants argue that Plaintiff's damages requests are not appropriate for class action litigation. It should first be noted that, to the extent Defendants are correct, that does not mean that a class should not be certified; Rule 23(c)(4) allows a court to grant class action status only to particular issues.

■ Defendants' argument that the Court should deny class action of Plaintiff's actual damage claim under TILA is supported by *Perrone, supra.* That court held, "Since individual reliance is necessary to prove actual damages, a class action may not be certified on this issue." *Perrone* at 440. *Also see Stout v. J.D. Byrider,* 228 F.3d 709, 718(6th Cir.2000)(holding that TILA issues should not be certified for class action status when individual reliance will be at issue). Therefore, the Court will deny class certification of Plaintiff's actual damages claim.

■ Defendants likewise argue that the Court should deny class action status of Plaintiff's claim for actual damages under he MCPA. Support for Defendants' argument is found in *Van Vels v. Premier Athletic Center of Plainfield, Inc.,* 182 F.R.D. 500, 509 (W.D.Mich.1998), where the court stated: "[T]he MCPA limits monetary damages to consumers in class actions to 'actual damages.' Mich. Comp. Laws § 445.911(3). This limitation means that consumers may only obtain 'the difference between the actual value of the property when the contract was made and the value that it would have possessed if the representations had been true.' *Mayhall v. A.H. Pond Co.,* 129

Mich.App. 178, 341 N.W.2d 268, 271 (1983). Furthermore, the weight of the case law for computing 'actual damages' in cases of undisclosed finance rates says that the damages should be computed by taking the difference between actual finance rate and the rate that the consumer could obtain in the marketplace. *See Wiley v. Earl's Pawn & Jewelry, Inc.,* 950 F.Supp. 1108, 1114 (S.D.Ala.1997); *McCoy v. Salem Mortgage Co.,* 74 F.R.D. 8, 13 (E.D.Mich. 1976). This means that an individual assessment of the class members' credit worthiness is necessary to compute actual damages."

The Court declines to follow *Van Vels* on this point. The only case that *Van Vels* relied upon that addresses actual damages under the MCPA was *Mayhall,* which set forth a simple formula for determining actual damages: compare the value of what was given with that which was promised. The cases upon which the *Van Vels* court relied on to hold that each individual class members' credit worthiness would have to be evaluated, are TILA cases. And, those TILA cases, as described by *Van Vels,* advocate a contrary formula that than set forth in *Mayhall;* the TILA cases say to compare the actual rate that was given with what was available in the market place, rather than comparing what was given with what was promised.

Furthermore, as the *Van Vels* court noted, there are no statutory damages for class actions under the MCPA; only actual damages are authorized. Thus, if, as *Van Vels* concluded, actual damages require individual determination and are, therefore, inappropriate for class action certification, the effect would be to render class actions under the MCPA unavailable for cases involving undisclosed or misleading finance rates. Such a result is clearly contrary to the MCPA's purpose. "This remedial provision of the Consumer Protection Act should be construed liberally to broaden the consumers' remedy, especially in situations involving consumer frauds affecting a large number of persons." *Dix* at 417, 415 N.W.2d 206.

For these reasons, the Court declines to follow *Van Vels* on this point. The Court

will follow *Mayhall* to find that actual damages under the MCPA are determined by comparing what was promised with what was given—a determination that can easily be performed by viewing the class members' Promissory Notes. Accordingly, the Court will grant class certification of Plaintiff's claim for actual damages under the MCPA.

 Finally, Defendants argue that class certification is inappropriate because Plaintiff seeks cancellation of all balances due, even though he and most class members do not owe any balances. In support, Defendants cite *Nelson v. United Credit Plan, Inc.*, 77 F.R.D. 54, 58 (E.D.La.1978), which held, "[W]e note that the propriety of ever pursuing rescission under the Truth–in–Lending Act through a class action is open to serious doubt." The court reasoned that there is an "obvious conflict among the interests of parties seeking rescission relief from a credit institution of limited solvency." *Id.*

In Reply, Plaintiff states that he is not seeking recision. He requests only that any class members' loan balances comprised of illegal interest be canceled. Plaintiff states that this is an appropriate equitable remedy, but he cites no authority in support.

Plaintiff's Complaint does not seek recision. Granted, his request for "cancellation of all balances due" is overly broad, as the class members are certainly responsible for paying the amount of principal they borrowed. However, should the class members prevail on the MCPA claim, they may be entitled to the difference between the amount of the Finance Charge disclosed on their Promissory Notes and the amount of the actual finance charge when the check cashing fee is incorporated. *Mayhall, supra.* Thus, it makes sense that those class members who have not paid their debt to Defendants should be relieved of having to pay the excess finance charges, if they prevail.

The Court refers to the damages that would be available to Plaintiff's under the MCPA instead of TILA because Plaintiff's request for the cancellation of all balances due is made in reference to Plaintiff's MCPA claim, not the TILA claim. (See *Complaint* at 13, 16 and 18). Thus, the *Nelson* court's holding that recision claims are not appropri-ate for class action certification under TILA is not applicable.

It should finally be noted that, as Franks stated in his affidavit, the vast majority of class members have paid their debt in full. Thus, the possibility that a few class members would seek cancellation of part of their debt should not deter the Court from certifying this classic Rule 23(b)(3) case for class certification.

## V. *Conclusion*

For the reasons above stated, the Court grants Plaintiff's Renewed Motion for Class Certification, except that class certification of Plaintiff's claim for actual damages under TILA is denied. Further, a sub-class involving those class members who signed Promissory Notes that include the arbitration and release provisions, and whose Promissory Notes partially incorporate the check cashing fee into the Annual Percentage Rate and Finance Charges, is conditionally certified.

**IT IS SO ORDERED.**